## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**WESLEY SHANE AUSTIN**                                  **CIVIL ACTION**

**VERSUS**                                               **NUMBER: 19-11361**

**ROBERT TANNER, WARDEN; <u>ET</u> <u>AL</u>.**         **SECTION: "D" (5)**

## <u>REPORT AND RECOMMENDATION</u>

Before the Court are the Motion to Dismiss (Rec. doc. 17), the Motion for Summary Judgment (Rec. doc. 51), and the Motion to Stay Discovery (Rec. doc. 53) filed by Defendants Robert Tanner, Dr. Robert Cleveland, Beverly Kelly, and Lesley Wheat (collectively, "Defendants"). Plaintiff opposes the motion to dismiss (Rec. docs. 21, 24) and the motion to stay discovery (Rec. doc. 56), but untimely opposed the motion for summary judgment three months after it was filed. (Rec. doc. 65).

## I.    Background

On June 22, 2019, Plaintiff Wesley Shane Austin filed his complaint under 42 U.S.C. § 1983, in which he alleges that Defendants violated his Eighth Amendment right under the Constitution to be free from cruel and unusual punishment through deliberate medical indifference. (Rec. doc. 1).

While Plaintiff's complaint lists the sick calls that he made and the doctor's appointments that he attended, Plaintiff specifically alleges the following violations by Defendants:

1.    Cleveland was deliberately indifferent when he failed to refer Plaintiff to the proper specialist and neurologists.

2.    Plaintiff alleges that Tanner exercised deliberate indifference by failing to comply with Cleveland's pain management specialist and for no longer having a pain management specialist on contract. Plaintiff

further alleges that Tanner failed to intervene after being notified by plaintiff of "medical staff's wrong doing."

3. Defendant Kelly was deliberately indifferent when she failed to investigate Plaintiff's complaints and to oversee the medical staff at Rayburn Correctional Center ("RCC").

4. Defendant Wheat exercised deliberate indifference when she failed to comply with Cleveland's referral to the pain management specialist and by failing to properly convey Cleveland's prescriptions for medications.

(Rec. doc. 1-1 at ¶¶ 74-77, 81-86). Defendants now move for summary judgment on Plaintiff's claims, arguing that there is no genuine issue of material fact that Plaintiff received adequate medical treatment at the RCC.

## II.   Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322).

### III.     Law and Analysis

####      A.     Defendants are Entitled to Immunity Under the Eleventh Amendment to the Extent that Austin Sues Them in Their Official Capacities

It is unclear from Plaintiff's complaint whether he sues Defendants for monetary damages in their official capacities. To the extent that he does, Defendants are entitled to summary judgment with respect to any such federal claims under Section 1983. RCC employs all four Defendants, making them state officials or employees of the Louisiana Department of Public Safety and Corrections. State officials and employees sued in their official capacities for monetary damages are not "persons" subject to suit under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Stotter v. Univ. of Tex.*, 508 F.3d 812, 821 (5th Cir. 2007); *Am. Civil Liberties Union v. Blanco*, 523 F. Supp. 2d 476, 479 (E.D. La. 2007); *Tyson v. Reed*, Civ. A. No. 09-7619, 2010 WL 360362, at *4 (E.D. La. Jan. 21, 2010); *Searls v. Louisiana*, Civ. A. No. 08-4050, 2009 WL 653043, at *6 (E.D. La. Jan. 21, 2009); *Demouchet v. Rayburn Corr. Ctr.*, Civ. A. No. 07-1694, 2008 WL 2018294, at *3 (E.D. La. May 8, 2008).

The Supreme Court has made it clear that Section 1983 does not allow a plaintiff to seek a monetary remedy against a state for alleged deprivations of civil liberties because "[t]he Eleventh Amendment bars such suits unless the State has waived its immunity." *Will*, 491 U.S. at 66 (citing *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 472-73 (1987)). States, officials of the state acting in their official capacities, and government entities that are considered "arms of the State" are not "persons" under Section 1983. *Id.* at 70-71. They cannot be sued in federal court for violations under Section 1983 without the state's express waiver of sovereign immunity. *Id.* at 67.

Louisiana has not waived its Eleventh Amendment immunity. La. Rev. Stat. § 13:5106(A); *Cozzo v. Tangipahoa Parish Council–President Gov't*, 279 F.3d 273, 281 (5th Cir. 2002); *Jenkins v. Lee*, Civ. A. 98-2367, 1999 WL 97931 (E.D. La. Feb. 17, 1999). Because a

4

claim against a state official or employee in his official capacity for monetary damages is actually a claim against the state itself, any such claim is barred by the Eleventh Amendment. *Williams v. Thomas*, 169 F. App'x 285, 286 (5th Cir. 2006); *Tyson*, 2010 WL 360362, at *4; *Searls*, 2009 WL 653043, at *6; *Demouchet*, 2008 WL 2018294, at *3. Accordingly, this Court will recommend dismissal with prejudice of all claims against Tanner, Kelly, Wheat, and Cleveland in their official capacities.

### B.     Claims Against Cleveland and Wheat in Their Individual Capacities

Under the Eighth Amendment, a prisoner must prove that medical care has been denied him and that this denial constituted "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official acts with deliberate indifference "only if he knows that [an] inmate[] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A showing of deliberate indifference requires a prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Deliberate indifference is an extremely high standard to meet. *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019).

The case law is clear on this standard. Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. *See Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920

F.2d 320, 321 (5th Cir. 1991). "The decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. at 107). An incorrect diagnosis "does not suffice to state a claim for deliberate indifference." *Id.* (citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). If a prisoner receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain or other symptoms persist despite the treatment. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006); *Williams v. Chief of Medical Operations, Forrest Cty. Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010). In addition, a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011). A prisoner's disagreement with the course of his treatment is simply not cognizable under Section 1983. *Hall*, 190 F.3d at 697. "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos*, 41 F.3d at 235 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993)).

### 1.    Robert Cleveland

Plaintiff maintains that Cleveland exhibited deliberate indifference to his serious medical needs when he failed to timely refer Plaintiff to a neurologist until a year after the source of his pain and migraines was discovered, and discontinued the referral based on non-medical factors, which in turn caused the unnecessary and wanton infliction of pain. (Rec. doc. 1-1 at ¶¶ 67, 74, 75). Plaintiff cites to several medical records to support his allegations of deliberate indifference. (*Id.*). Plaintiff points to an October 23, 2017 sick call; a February

22, 2018 doctor's visit; and a letter to Defendant Tanner dated February 1, 2019. (*Id.*). However, each of these cited references demonstrates that Cleveland neither refused to treat Plaintiff nor ignored his complaints or intentionally treated Plaintiff incorrectly.

The evidence of record reveals that on October 23, 2017, Cleveland examined Plaintiff. (Rec. Doc. 51-15 at p. 46). Plaintiff alleges that during this visit, Cleveland referred Plaintiff to pain management. (Rec. doc. 1-1 at ¶ 47). Cleveland initially referred plaintiff to pain management, but he later discontinued this referral because the pain management specialist's contract ended in December 2017, shortly after Cleveland had referred Plaintiff. (Rec. doc. 51-6 at p. 2). Aside from the pain management referral, Cleveland listed a number of plans to determine a course of treatment for plaintiff. (Rec. doc. 51-15 at p. 46). Among these plans were to x-ray Plaintiff's c-spine and l-spine. (*Id.*). On November 7, 2017, Plaintiff's l-spine and c-spine were x-rayed, and both returned normal findings. (Rec. doc. 51-15 at pp. 47-48). Worried that there had been a miscommunication, Plaintiff wrote a letter to Cleveland on December 9, 2017, in which he complained that the x-rays were of his "lower back" and that his pain specifically stemmed from the thoracic area, which Cleveland should have x-rayed. (*Id.* at p. 51). In response, Defendant Wheat assured Plaintiff that he would receive x-rays to his thoracic spine instead. (*Id.* at p. 53). On January 9, 2018, Plaintiff's thoracic spine was x-rayed, and, as with the l-spine and c-spine, the findings were normal. (*Id.* at p. 54).

On February 22, 2018, Cleveland referred plaintiff to the Neurology Clinic for an MRI. (*Id.* at pp. 57-59). That same day Cleveland also examined Plaintiff. (*Id.* st p. 59). Plaintiff was scheduled for pain management but, as noted above, it was no longer available at that time. (Rec. doc. 51-6 at p. 2). As a result, Cleveland decided to refer Plaintiff to Neurosurgery.

(*Id.*).  On April 4, 2018, Neurologist Dr. Charles Barkermeyer examined Plaintiff and ordered several labs.  (Rec. doc. 51-15 at pp. 61-63).  During the April 4 visit, Barkermeyer was unable to find anything wrong with Plaintiff from a neurological standpoint and ordered a clinic follow-up one year from the date of that visit.  (*Id.*).

As the medical records in evidence reveal, Cleveland did not ignore Plaintiff's request and instead used his medical expertise to institute a plan of action to determine what was the source of Plaintiff's alleged pain.  In October 2017, Cleveland examined Plaintiff, prescribed him pain medication, ordered x-rays of Plaintiff's spine, and referred Plaintiff to pain management.  Cleveland again examined Plaintiff on February 22, 2018, at which time he referred Plaintiff to neurosurgery because pain management was no longer available.  After Barkermeyer examined Plaintiff on April 4, 2018, Cleveland further examined Plaintiff on April 30, 2018 and prescribed him pain medication.  Cleveland saw Plaintiff again on November 7, 2018, when he prescribed more pain medication.  A little over a year later, Barkermeyer examined Plaintiff on April 17, 2019.  (*Id.* at p. 85).  During this visit, Barkermeyer again found nothing wrong with Plaintiff from a neurological standpoint and ordered a clinic follow-up one year from the date of that visit.  (*Id.*).

The Court finds that Cleveland has routinely and timely referred Plaintiff to the proper specialist.  Moreover, before Plaintiff filed this lawsuit, Barkermeyer, a medical specialist, evaluated Plaintiff on at least two occasions. Plaintiff is merely disgruntled with the specialist to whom he was referred and not that any medical personnel ignored and failed to treat him.

The Court further finds that Cleveland treated Plaintiff properly and to the best of his medical judgment.  Plaintiff points to medical records to support his argument that Cleveland

ordered x-rays after informing Plaintiff "that the x-ray was the improper method of imaging." (Rec. doc. 1-1 at ¶ 76). Plaintiff alleges that Cleveland knew the x-ray "would not show the problem, and still ordered them to cause more unreasonable delay." (*Id.*). Plaintiff specifically cites doctor's visits dated January 12, 2017; July 3, 2017; and October 23, 2017, as well as a letter to Cleveland dated December 9, 2017. (*Id.*).

On January 12, 2017, Dr. Cleveland visited Plaintiff to discuss his MRI results with him. (Rec. doc. 51-15 at pp. 1-2, 14; Rec. doc. 51-6 at p. 2). During this visit, Cleveland scheduled an x-ray for Plaintiff's right shoulder because Plaintiff complained of right shoulder pain. (Rec. doc. 51-15 at p. 14; Rec. doc. 51-6 at p. 3). Plaintiff's right shoulder was x-rayed on February 23, 2017, and those findings were normal. (Rec. doc. 51-15 at p. 15). On May 24, 2017, Plaintiff placed a sick call, alleging that blood tests were not ordered and that there was no follow-up to his x-rays taken a few months earlier. (*Id.* at p. 16). However, earlier, on August 22, 2016, Plaintiff inquired into the status of his blood work for HIV and Hepatitis C. (*Id.* at p. 93). Defendant Wheat responded on August 31, 2016 and informed Plaintiff that he had been tested for Syphilis, HIV, and Hepatitis A, B, and C before arriving at RCC and that all tests were negative. (*Id.* at p. 94). Cleveland also discussed with Plaintiff the findings of his right shoulder x-ray on July 3, 2017. (*Id.* at p. 94; Rec. doc. 51-6 at p. 3).

During the same appointment, Cleveland discussed a plan of care with Plaintiff, ordering x-rays for the c-spine, a prescription of 500 mg of Naproxen for one year and 15 mg Mobic daily for one year. (Rec. doc. 51-15 at pp. 18-19). Cleveland then renewed Plaintiff's medications on July 10, 2017 after a sick call from Plaintiff, discontinuing the Mobic and ordering 500 mg of Naproxen and 5 mg of Baclofen. (*Id.* at p. 20). On the same day, Plaintiff's c-spine was x-rayed, and all findings were normal. (*Id.* at p. 21).

Cleveland examined Plaintiff on October 23, 2017 after Plaintiff complained of back pain, neck pain, and migraines. (*Id.* at p. 46). Cleveland prescribed a plan of care that included 500 mg of Naproxen, as needed for one year, a discontinuance of Baclofen, an x-ray to c-spine and l-spine, a Hepatitis Panel, an HIV test, and to complete routine sick calls as needed. (*Id.*). Plaintiff's Naproxen was ordered, (Rec. doc. 51-16 at p. 60), Plaintiff's c-and l-spine were x-rayed on November 7, 2017, and both results were normal (Rec. doc. 51-15 at pp. 47-48), and Plaintiff's labs were taken on November 11, 2017, all of which were negative. (*Id.* at p. 49).

Unhappy with the results of the x-rays that he requested, (*id.* at p. 42), Plaintiff, on December 9, 2017, wrote a letter to Cleveland in which he requested to have his thoracic spine reviewed as soon as possible by MRI. (*Id.* at p. 104). In the letter, Plaintiff complained that the x-ray had been done on his lower back even though he had complained that most of his pain was in his neck and back between his shoulder blades. (*Id.*). However, Plaintiff had specifically complained of "mid/low back pain" during his October 23, 2017 visit with Cleveland. (*Id.* at p. 46). Plaintiff had also complained of neck pain during this visit, and Cleveland ordered x-rays for the c-spine. (*Id.*). The c-spine is, essentially, the neck. (*Id.*). Cleveland also ordered x-rays for the l-spine, or Plaintiff's lower back area. (*Id.* at p. 47). Both findings were normal. (*Id.* at 47-48). Because both findings were normal, Cleveland had no reason to order an MRI. (Rec. doc. 51-6 at p. 3).

On December 15, 2017, Defendant Wheat responded on behalf of Cleveland and informed Plaintiff that he had been added to the x-ray call out list for his thoracic spine. (*Id.* at pp. 51, 53). Plaintiff's thoracic spine was x-rayed on January 9, 2018, yet the findings were normal, and there was "no evidence of acute osseous or soft tissue abnormality." (*Id.* at p.

54).  The Court finds that the medical records reveal that all of the x-rays conducted on Plaintiff indicated normality.  The Fifth Circuit has repeatedly held that "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. at 107).

The Court finds that Plaintiff's allegations are no more than a disagreement with his medical treatment.  Plaintiff complained of back pain and migraines and was treated by both Cleveland and Barkermeyer.  Plaintiff was provided pain medication and was allowed to keep some medications on his person.  (Rec. doc. 51-15).  As this Court has noted, unsuccessful medical treatment, acts of negligence, and medical malpractice do not arise to the level of deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances – which are not present here.  *See Banuelos*, 41 F.3d at 235; *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *Hall*, 190 F.3d at 697.  The Supreme Court has held that actual knowledge is an essential element of Plaintiffs' burden, as mere negligence cannot establish a constitutional violation.  *Farmer*, 511 U.S. at 835-38.  In this case, Plaintiff has failed to demonstrate deliberate indifference on the part of Cleveland.  The records submitted by Defendants reveal that Plaintiff has been treated repeatedly for the ailments of which he has complained.  He has failed to submit any competent evidence that Cleveland ever refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. For these reasons, the Court will recommend that Plaintiff's claims against Cleveland in his individual capacity be dismissed with prejudice.

### 2.    Lesley Wheat

It appears that Plaintiff alleges that Wheat exercised deliberate indifference by failing to comply with Cleveland's referral to a pain management specialist and by failing to properly convey Cleveland's prescriptions for medications. (Rec. doc. 1-1 at ¶ 86). Plaintiff alleges that he spent long periods of time without medication. (*Id.*). The Court finds that the medical records demonstrate that Plaintiff was removed from pain management and when notified, Wheat ensured that Plaintiff received the medication prescribed to him.

Defendants contend that Wheat was not responsible for referring Plaintiff to a pain management specialist. Cleveland treated Plaintiff on October 23, 2017 for his back pain and ordered x-rays. (Rec. doc. 51-15 at p. 46). During this visit, Cleveland originally planned to refer Plaintiff to pain management, but the pain management physician's contract ended in December 2017 and was not renewed. (Rec. doc. 51-6 at p. 2). During Plaintiff's next visit with Cleveland on February 22, 2018, Cleveland noted that pain management was no longer available, and that Plaintiff would be referred to the Neurology Clinic. (Rec. doc. 51-15 at p. 59). On April 4, 2018, Barkermeyer examined Plaintiff at the Neurology Clinic located at Elayn Hunt Correctional Center in St. Gabriel, Louisiana. (*Id.* at pp. 63-65). Plaintiff acknowledged his referral in writing, witnessed by Wheat. (*Id.* at p. 62). During this visit, Barkermeyer instructed Plaintiff to return to the clinic in one year. (*Id.* at 63-65). Wheat documented this referral. (*Id.* at p. 61). Plaintiff again saw Barkermeyer a little over a year later on April 17, 2019, at which time Barkermeyer again recommended that Plaintiff follow up in one year. (*Id.* at p. 85). This evidence demonstrates that Wheat did not fail to follow Cleveland's and Barkermeyer's referral order, and Plaintiff attended all referral appointments. (Rec. doc. 51-5 at p. 3). Even had Wheat negligently failed to schedule an

appointment, of which Plaintiff has cited this Court to no evidence, this still would not amount to deliberate indifference. *Thomas v. Carter*, 593 F. App'x 338, 344 (5th Cir. 2014).

The Court also finds that Wheat conveyed Cleveland's prescriptions for medications to the pharmacy in a timely manner, and she responded to all letters from Plaintiff in which he inquired about his medical history or condition. (*See generally* Rec. doc. 51-15; Rec. doc. 51-7 at ¶ 7). After Plaintiff transferred from Winn Correctional Center ("Winn") to RCC, Plaintiff wrote a letter on August 22, 2016 in which he inquired into the blood tests that the doctor at Winn had ordered. (Rec. Doc. 51-14 at p. 93). On August 31, 2016, Wheat responded to Plaintiff's letter, detailing which blood tests (Syphilis, HIV, and Hepatitis A, B and C) were taken by Winn and that they were all negative. (*Id.* at p. 94). Plaintiff refused his Mobic prescription on September 26, 2016, stating that it did not work. (Rec. doc. 51-15 at p. 7).

Plaintiff penned another letter to medical on October 22, 2016 about his MRI results, seeking to purchase a copy of his MRI images. (*Id.* at p. 9). Wheat responded on October 28, 2016, indicating that she was unable to give Plaintiff any part of his medical record while "incarcerated per DOC Regulation B-06-001/HC-33 with out [sic] appropriate recommendation" but that Plaintiff was on the waiting list to see the physician to discuss MRI results. (*Id.* at p. 10). Plaintiff sent an additional undated letter to an unidentified "medical coordinator," received by RCC on December 12, 2016, in which he inquired into the status of his MRI results and stated that he had lodged sick calls to no avail. (*Id.* at p. 11). Wheat again responded and informed Plaintiff that he was on the waiting list to see the physician to discuss MRI results, but that due to RCC's lack of a full-time physician, it would be delayed. (*Id.* at p. 12).

On November 30, 2017, Plaintiff wrote to Wheat to inquire about his HIV and Hepatitis test results. (*Id.* at p. 50). Wheat responded on December 12, 2017, informing Plaintiff that his test results were negative. (*Id.* at pp. 49, 52). Plaintiff, on December 9, 2017, penned a letter to Cleveland in which he sought to have his thoracic spine reviewed. (*Id.* at p. 51). On December 15, 2017, Wheat responded on behalf of Cleveland, informing Plaintiff that he had been added to the x-ray call list for his thoracic spine. (*Id.* at 53). Contrary to Plaintiff's arguments, Cleveland's orders were followed, and Plaintiff's thoracic spine was x-rayed on January 9, 2018. (*Id.* at p. 54). The findings were unremarkable. (*Id.*). Plaintiff's x-rays of his thoracic spine were normal.

Wheat witnessed Plaintiff's Acknowledgement & Consent Off-Site Specialty Referral form, in which Plaintiff acknowledged that RCC's medical department had referred him to the Neurology Clinic on April 4, 2018. (*Id.* at p. 62). Plaintiff saw Barkermeyer in the Neurology Clinic on that date. (*Id.* at pp. 63-65). Wheat registered Plaintiff's return trip return form from the Neurology Clinic, noting that Plaintiff was to receive various blood tests on April 24, 2018 and that he was to follow up with Neurology in one year. (*Id.* at p. 61). Plaintiff's blood tests were completed on April 24, 2018. (*Id.* at pp. 64-65). Plaintiff returned to the Neurology Clinic at EHCC on April 17, 2019. (*Id.* at pp. 85-87).

On October 29, 2018, Plaintiff again wrote a letter to the unidentified "Medical Director" about his pain and treatment. (*Id.* at p. 70). Wheat responded on October 31, 2018, informing Plaintiff that his letter had been forwarded to her, that he had been scheduled to see the doctor the following week, and that his concerns should be discussed with the doctor at that time. (*Id.* at p. 71). Plaintiff then penned a letter on November 19, 2018 to "Medical," inquiring into the status of his naproxen prescription. (*Id.* at p. 74). Wheat responded to

Plaintiff's letter on the November 20, 2018, explaining that she had contacted the pharmacy and that Plaintiff's medication would soon be available to him. (*Id.* at p. 76). Significantly, Wheat was not responsible for conveying the naproxen prescription to the pharmacy; another medical official, L. Buckley, signed off on November 8, 2018 that the prescription had been sent to the pharmacy. (Rec. doc. 51-5 at p. 3). It is unclear from the record why Plaintiff's prescription for Naproxen was ordered on November 22, 2018, two days after Wheat responded to Plaintiff's letter. (*Id.*). Although not responsible for putting in the original order, Wheat promptly responded to Plaintiff's letter and immediately made sure his prescription for naproxen had been ordered. (*Id.*).

Plaintiff also wrote a letter to Cleveland on November 19, 2018, stating, "I understand that I have an appointment to see an unnamed neurologist around April 2019. I also understand that my entire spine (cervical lumbar) and right shoulder have been observed by x-ray and they have all shown no problems." (*Id.* at p. 75). Plaintiff then seeks an MRI for his spine and right shoulder. (*Id.*). Wheat responded on behalf of Cleveland on November 20, 2018, stating that Plaintiff must see a neurologist who will determine Plaintiff's need for further testing. (*Id.* at p. 77).

Plaintiff again wrote to Cleveland on May 26, 2019, informing him that two declarations were enclosed to reflect Plaintiff's "side of [his] medical conditions that [his] medical file does not show." (*Id.* at p. 94). Plaintiff further complains that Barkermeyer "has no interes [sic] in finding the other problems with [his] back, shoulder, hip, and knees." (*Id.*). Wheat responded to this letter on May 28, 2019, informing Plaintiff that his "Declarations," (*id.* at pp. 87-93), had been received and placed in his medical records and that if his

conditions worsened, he needed to make a routine sick call. (*Id.* at p. 95). This was the last time that Wheat was involved in Plaintiff's medical care relevant to this lawsuit.

The Court finds that Plaintiff cannot meet the standard of deliberate indifference. There is no evidence that Wheat ignored his medical needs, failed to assess him seriously, intentionally withheld care, refused treatment, or exhibited any unfounded disregard to Plaintiff's medical needs. There is no evidence in the record to indicate that Wheat acted with deliberate indifference, let alone that she wantonly inflicted pain "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105-06. At no time did she ignore Plaintiff's requests or Cleveland's orders as they pertained to him. Accordingly, this Court will recommend dismissal of Plaintiff's claims against Wheat with prejudice.

### C.    Supervisory Officials Robert Tanner and Beverly Kelly

Tanner – the Warden at RCC – and Kelly – the Assistant Warden of Treatment at RCC – are supervisory officials. It is well-settled that a supervisory official is not liable under Section 1983 for the actions of subordinates on any theory of vicarious liability. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). "Rather, a plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation." *Evett v. Deep East Tex. Narcotics Trafficking Task Force*, 330 F.3d 681, 689 (5th Cir. 2003 (quoting *Thompkins*, 828 F.2d at 304); *see also Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor."). Accordingly, "[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the

constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotation marks and citation omitted).

Defendants have submitted more than 200 pages of medical records with their motion for summary judgment that reveal that Plaintiff has received extensive care and monitoring throughout his current incarceration both at RCC and by specialists outside RCC. (Plaintiff even sues Barkermeyer, who does not work directly for the RCC.)  As noted above, "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos*, 41 F.3d at 235.  These records demonstrate that Defendants treated Plaintiff when requested, monitored him, provided him with medication, and that Plaintiff received timely responses to his various letters addressed to medical and administrative officials, including Defendants Tanner and Kelly.  For the reasons outlined below, the Court finds that Plaintiff cannot point to any evidence to demonstrate that Tanner and Kelly exhibited deliberate indifference to Plaintiff's serious medical needs.

### 1.    Robert Tanner

Plaintiff alleges that Tanner displayed deliberate indifference by failing to comply with Cleveland's referral to a pain management specialist (Rec. doc. 1-1 at ¶ 81) and by failing to intervene after being notified of the medical staff's wrongdoing.  (*Id.* at ¶ 82). Plaintiff's medical records reveal, however, that pain management was no longer available at RCC when it was ordered for Plaintiff, and Tanner, a non-medical professional (Rec. doc. 51-7), was not responsible for treating Plaintiff.  (*Id.*).  The Court further finds that there was no reason for Tanner to intervene or second-guess the medical recommendations of Cleveland or RCC's medical staff who were involved in Plaintiff's treatment.

Tanner, a non-medical professional, is neither responsible for nor has the authority to refer plaintiff to a pain management specialist. (*Id.*). Plaintiff refers to specific medical records to support his argument that Tanner failed to comply with Cleveland's referral to a pain management specialist. Specifically, Plaintiff cites a letter from Tanner to Attorney Emily H. Posner dated November 14, 2018, (Rec. doc. 51-9), letters to Tanner dated January 14, 2019, (Rec. doc. 51-13), and January 27, 2019, (Rec. doc. 51-12), as well a response from Tanner dated February 1, 2019. (*Id.*).

Posner wrote a letter to Tanner, received by RCC on November 5, 2018, in which she sought additional treatment for Plaintiff. (Rec. doc. 51-9). Tanner responded to that letter on November 14, 2018, informing Posner that Plaintiff's medical files were reviewed and that Cleveland had recommended no additional treatment. (*Id.*). Plaintiff then penned a letter to Tanner on January 14, 2019, informing Tanner that he is in constant pain and that he needs treatment. (Rec. doc. 1-1 at ¶ 63; Rec. doc. 51-13). Tanner promptly responded on January 16, 2019, informing Plaintiff that "Dr. Cleveland is the Health Care authority for" RCC. (Rec. doc. 51-11 at p. 38). Tanner further explained that Cleveland "establishes the treatment plan for each offender," including Plaintiff, and that all medical concerns should be discussed with Cleveland and his staff through the proper procedures. (*Id.*).

Ultimately, Plaintiff wrote a second letter to Tanner on January 27, 2019 informing Tanner that on October 23, 2017, Cleveland had referred Plaintiff to pain management, but that Tanner never referred him for further treatment. (Rec. doc. 1-1 at ¶ 66). On February 1, 2019, Tanner responded and informed Plaintiff that his referral to pain management had been "discontinued due to the completion of the contract with the Pain Management Physical in December of 2017." (Rec. doc. 51-12). The letter informed Plaintiff that the physician had

opted not to renew the contact, that pain management was no longer available, and that offenders who were going to pain management were subsequently referred to orthopedic for evaluation and treatment, which ultimately prolonged the wait time for appointments due to the increase in the number of offenders requiring treatment. (*Id.*). Tanner continued to explain in the letter that Cleveland had referred Plaintiff to the neurologist on February 22, 2018 "for evaluation by a specialist regarding the pain" that Plaintiff experienced, that on April 4, 2018, Plaintiff had been evaluated by a neurologist, and that Plaintiff had "an appointment scheduled to follow up with Neurology within the next few months." (*Id.*).

The exhibits attached to Defendants' motion reveal that Plaintiff was treated when requested, monitored, provided medication, and received timely responses to his various letters addressed to medical and administrative officials. This Court cannot find – and Plaintiff points the Court to no – evidence to prove that Plaintiff had been ignored and/or went untreated by Tanner. Accordingly, the Court will recommend that Plaintiff's claims against Tanner be dismissed.

### 2. Beverly Kelly

Plaintiff alleges that Kelly exercised deliberate indifference by failing to investigate inmate complaints about lack of medical treatment. (Rec. doc. 1-1 at ¶ 84). Plaintiff maintains that he requested his medical file and Kelly allegedly denied the request on the ground that departmental policy prohibited an inmate from receiving any portion of his medical file. (*Id.*). Plaintiff contends that he wrote a letter to Kelly on October 29, 2018, to which he did not receive a response. Plaintiff alleges that he has suffered an unnecessary and wanton infliction of pain as a result of Kelly's inactions. (*Id.*).

Plaintiff sought his medical records on October 22, 2016 in a letter directed only to "Medical R.C.C." (Rec. doc. 51-15 at p. 108). Although not directed to a specific person, Wheat responded to Plaintiff, not Kelly. (*Id.* at p. 109). In that response, Wheat informed plaintiff that DOC Regulation B-06-001/HC 33 prevents RCC from providing Plaintiff with any part of his medical record without the appropriate recommendation. (*Id.*). Wheat thus responded to Plaintiff's request, but regulations prohibited her from disclosing his medical file to him. If Plaintiff seeks to challenge that regulation, Kelly and/or Wheat are not the proper parties to sue.

Plaintiff also wrote a letter on October 29, 2018, but neither was that letter addressed to Kelly as Plaintiff argues. (*Id.* at 169). Plaintiff addressed the October 29 letter to the "Medical Director," which was not Kelly. (*Id.*). Kelly is not the medical director and has never held that position at RCC. (Rec. doc. 51-4 at ¶ 19). The letter was forwarded to Wheat and contrary to Plaintiff's protestations, Wheat responded to the letter two days later on October 31, 2018. (Rec. doc. 51-15 at p. 170). In that response, Wheat informed Plaintiff that he was scheduled to see the doctor the following week and that his medical concerns could be discussed at that time. (*Id.*).

Again, these exhibits demonstrate that Plaintiff was treated when requested, monitored, provided medication, and he received timely responses to his various letters addressed to medical and administrative officials. Plaintiff has failed to city to any evidence to show that he had been ignored and/or went untreated by Kelly. Accordingly, The Court will recommend dismissal of Plaintiff's claims against Kelly as well.

## IV.    Conclusion

For the foregoing reasons,

20

**IT IS RECOMMENDED** that the Motion for Summary Judgment (Rec. doc. 51) be **GRANTED**, and Plaintiff's claims against Robert Tanner, Dr. Robert Cleveland, Beverly Kelly, and Lesley Wheat be **DISMISSED**.[1]

**NOTICE OF RIGHT TO OBJECT**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).[2]

New Orleans, Louisiana, this 24th day of _____February_____, 2022.

MICHAEL B. NORTH
**UNITED STATES MAGISTRATE JUDGE**

---

[1] Because the Court has recommended the grant of the Motion for Summary Judgment, the Court need not consider Defendants' Motion to Dismiss. (Rec. doc. 17). That motion is **DISMISSED WITHOUT PREJUDICE AS MOOT**. Similarly, the Court need not consider the motion to stay discovery (Rec. doc 53) filed by these Defendants. That motion is also **DISMISSED AS MOOT**. The Court also need not consider Defendant's claim of qualified immunity.

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.